```
         FILED ____      ✓ LODGED
         RECEIVED ____   ____ COPY

              OCT 1 3 2016

         CLERK U S DISTRICT COURT
           DISTRICT OF ARIZONA
         BY_____ DEPUTY
```

JOHN S. LEONARDO
United States Attorney
District of Arizona

JAMES M. TRUSTY
Chief, Organized Crime and Gang Section
Department of Justice
Criminal Division

TRACY VAN BUSKIRK
Arizona State Bar No. 022097
DIMITRA H. SAMPSON
Arizona State Bar No. 019133
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1200
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: tracy.van.buskirk@usdoj.gov
Email: dimitra.sampson@usdoj.gov

HANS B. MILLER
Florida Bar No. 12607
Trial Attorney
1301 New York. Ave, NW, Suite 700
Washington, DC 20530
Telephone: 202-353-2099
Hans.Miller@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR-15-8076-003-PCT-DGC (JZB) |
|---|---|
| Plaintiff, | |
| vs. | **PLEA AGREEMENT** |
| Randall Franklin Begay, | |
| Defendant. | |

Plaintiff, United States of America, and the defendant, RANDALL FRANKLIN BEGAY, hereby agree to dispose of this matter on the following terms and conditions:

1. **PLEA**

cc: AUSA / Michael Smith / Probation

The defendant will plead guilty to Count 1 of the Second Superseding Indictment charging the defendant with a violation of Title 18, United States Code (U.S.C.) § 1962(d), Conspiracy to Participate in a Pattern of Racketeering Activity, a Class A felony offense.

2. **MAXIMUM PENALTIES**

   a. A violation of 18 U.S.C. § 1962 (d) as charged, Conspiracy to Participate in a Pattern of Racketeering Activity, through acts involving murder, is punishable by a maximum fine of $250,000, a maximum term of imprisonment of up to life, or both, and a term of supervised release not more than five years. According to the Sentencing Guidelines issued pursuant to the Sentencing Reform Act of 1984, the Court shall order the defendant to:

   (1) make restitution to any victim of the offense pursuant to 18 U.S.C. § 3663 and/or 3663A, unless the Court determines that restitution would not be appropriate;

   (2) pay a fine pursuant to 18 U.S.C. § 3572, unless the Court finds that a fine is not appropriate;

   (3) serve a term of supervised release when required by statute or when a sentence of imprisonment of more than one year is imposed (with the understanding that the Court may impose a term of supervised release in all other cases); and

   (4) pay upon conviction a $100 special assessment for each count to which the defendant pleads guilty pursuant to 18 U.S.C. § 3013(a)(2)(A).

   b. The Court is required to consider the Sentencing Guidelines in determining the defendant's sentence. However, the Sentencing Guidelines are advisory, and the Court is free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crime of conviction, unless there are stipulations to the contrary that the Court accepts.

3. **AGREEMENTS REGARDING SENTENCING**

   a. <u>Restitution</u>. Pursuant to 18 U.S.C. § 3663 and/or 3663A, the defendant specifically agrees to pay full restitution, regardless of the resulting loss amount but in no event more than $500,000, to all victims directly or proximately harmed by the

defendant's "relevant conduct," including conduct pertaining to any dismissed counts or uncharged conduct, as defined by United States Sentencing Guidelines (U.S.S.G.) § 1B1.3, regardless of whether such conduct constitutes an "offense" under 18 U.S.C. §§ 2259, 3663 or 3663A. The defendant understands that such restitution will be included in the Court's Order of Judgment and that an unanticipated restitution amount will not serve as grounds to withdraw the defendant's guilty plea or to withdraw from this plea agreement.

      b.    <u>Assets and Financial Responsibility.</u> The defendant shall make a full accounting of all assets in which the defendant has any legal or equitable interest. The defendant shall not (and shall not aid or abet any other party to) sell, hide, waste, spend, or transfer any such assets or property before sentencing, without the prior approval of the United States (provided, however, that no prior approval will be required for routine, day-to-day expenditures). The defendant also expressly authorizes the United States Attorney's Office to immediately obtain a credit report as to the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court. The defendant also shall make full disclosure of all current and projected assets to the U.S. Probation Office immediately and prior to the termination of the defendant's supervised release or probation, such disclosures to be shared with the U.S. Attorney's Office, including the Financial Litigation Unit, for any purpose. Finally, the defendant shall participate in the Inmate Financial Responsibility Program to fulfill all financial obligations due and owing under this agreement and the law.

If the defendant is a member of a Native American tribe that provides "per capita" payments to its members, the defendant agrees that any such "per capita" payment shall be paid over to the Clerk of the Court and applied to the defendant's restitution obligation until restitution to all victims is paid in full.

      c.    <u>Applicable Base Offense Level.</u> The parties agree that pursuant to U.S.S.G. §§ 2E1.1 (a) (2) and 2A1.2 (a), the Base Offense Level for the single count of conviction is level **38**.

d. <u>Role Adjustment.</u> The parties agree that neither party will seek either an upward or downward adjustment for role pursuant to U.S.S.G. §§ 3B1, et seq.

e. <u>Acceptance of Responsibility.</u> If the defendant makes full and complete disclosure to the U.S. Probation Office of the circumstances surrounding the defendant's commission of the offense, and if the defendant demonstrates an acceptance of responsibility for this offense up to and including the time of sentencing, the United States will recommend a two-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G.§ 3E1.1(a). If the defendant has an offense level of 16 or more, the United States will recommend an additional one-level reduction in the applicable Sentencing Guidelines offense level pursuant to U.S.S.G. § 3E1.1(b).

**4. AGREEMENT TO DISMISS OR NOT TO PROSECUTE**

a. Pursuant to Fed. R. Crim. P. 11(c)(1)(A), at sentencing, the United States shall dismiss the following two cases currently pending in the District of Arizona: CR 15-8157 DJH; and CR 15-8158-JJT as to this defendant only.

b. This agreement does not, in any manner, restrict the actions of the United States in any other district or bind any other United States Attorney's Office.

**5. COURT APPROVAL REQUIRED; REINSTITUTION OF PROSECUTION**

a. If the Court, after reviewing this plea agreement, concludes that any provision contained herein is inappropriate, it may reject the plea agreement and give the defendant the opportunity to withdraw the guilty plea in accordance with Fed. R. Crim. P. 11(c)(5).

b. If the defendant's guilty plea or plea agreement is rejected, withdrawn, vacated, or reversed at any time, this agreement shall be null and void, the United States shall be free to prosecute the defendant for all crimes of which it then has knowledge and any charges that have been dismissed because of this plea agreement shall automatically be reinstated. In such event, the defendant waives any and all objections, motions, and defenses based upon the Statute of Limitations, the Speedy Trial Act, or constitutional restrictions in bringing later charges or proceedings. The defendant understands that any

statements made at the time of the defendant's change of plea or sentencing may be used against the defendant in any subsequent hearing, trial, or proceeding subject to the limitations of Fed. R. Evid. 410.

6. **WAIVER OF DEFENSES AND APPEAL RIGHTS**

The defendant waives (1) any and all motions, defenses, probable cause determinations, and objections that the defendant could assert to the indictment or information; and (2) any right to file an appeal, any collateral attack, and any other writ or motion that challenges the conviction, an order of restitution or forfeiture, the entry of judgment against the defendant, or any aspect of the defendant's sentence, including the manner in which the sentence is determined, including but not limited to any appeals under 18 U.S.C. § 3742 (sentencing appeals) and motions under 28 U.S.C. §§ 2241 and 2255 (habeas petitions), and any right to file a motion for modification of sentence, including under 18 U.S.C. § 3582(c). This waiver shall result in the dismissal of any appeal, collateral attack, or other motion the defendant might file challenging the conviction, order of restitution or forfeiture, or sentence in this case. This waiver shall not be construed to bar a claim by the defendant of ineffective assistance of counsel or of "prosecutorial misconduct" (as that term is defined by Section II.B of Ariz. Ethics Op. 15-01 (2015)).

7. **DISCLOSURE OF INFORMATION**

    a. The United States retains the unrestricted right to provide information and make any and all statements it deems appropriate to the U.S. Probation Office and to the Court in connection with the case.

    b. Any information, statements, documents, and evidence that the defendant provides to the United States pursuant to this agreement may be used against the defendant at any time.

    c. The defendant shall cooperate fully with the U.S. Probation Office. Such cooperation shall include providing complete and truthful responses to questions posed by the U.S. Probation Office including, but not limited to, questions relating to:

        (1) criminal convictions, history of drug abuse, and mental illness; and

(2) financial information, including present financial assets or liabilities that relate to the ability of the defendant to pay a fine or restitution.

8. **FORFEITURE, CIVIL, AND ADMINISTRATIVE PROCEEDINGS**

   a. Nothing in this agreement shall be construed to protect the defendant from administrative or civil forfeiture proceedings or prohibit the United States from proceeding with and/or initiating an action for civil forfeiture. Pursuant to 18 U.S.C. § 3613, all monetary penalties, including restitution imposed by the Court, shall be due immediately upon judgment and subject to immediate enforcement by the United States. If the Court imposes a schedule of payments, the schedule of payments shall be merely a schedule of minimum payments and shall not be a limitation on the methods available to the United States to enforce the judgment.

9. **ELEMENTS**

   **Conspiracy to Participate in a Pattern of Racketeering Activity**

   Beginning in about 2008 and continuing through at least July 2015, in the District of Arizona, within the confines of the Navajo Nation Indian Reservation, Indian Country:

   1. An enterprise existed as defined in 18 U.S.C. § 1961(4), that is, a group of individuals associated in fact known as the Red Skin Kingz ("RSK");

   2. The enterprise engaged in, or its activities affected interstate commerce;

   3. The enterprise engaged in racketeering activity as defined in 18 U.S.C. §§ 1961(1) and (5), that is, any act or threat involving murder, robbery, arson, kidnapping as defined in Arizona law; drug trafficking in violation of 21 U.S.C. §§ 841 and 846; obstruction of justice in violation of 18 U.S.C. §§ 1503 and 1512.

   4. The defendant conspired to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering conduct, to include the commission of acts involving murder, drug distribution and obstruction of justice.

10. **FACTUAL BASIS**

a. The defendant, RANDALL FRANKLIN BEGAY, admits that the following facts are true and that if this matter were to proceed to trial the United States could prove the following facts beyond a reasonable doubt:

b. At all times relevant to this Second Superseding Indictment, DEVAN EDWARD LEONARD, KYLE FILBERT GRAY, LUCILLE JEAN LEONARD, RANDALL FRANKLIN BEGAY and URIAH SHAY, each of whom were enrolled members of the Navajo Nation Indian Reservation, a federally recognized Native American tribe, together with other persons, known and unknown, were members and/or associates of RED SKIN KINGZ gang.

c. RED SKIN KINGZ is a violent street gang which was founded in 2003 by "Roland" LNU. Roland initially formed the gang in Del Muerto, within the confines of the Navajo Nation in the District of Arizona. Since approximately 2008 RED SKIN KINGZ, also known as KINGZ and WESTSIDE, has been centered in and around Lukachukai, also within the confines of the Navajo Nation in the District of Arizona.

d. RED SKIN KINGZ membership and associates are comprised of individuals associated together for a common purpose of engaging in a course of conduct over a period of time. The common purposes include: violence; threats of violence; intimidation to preserve and promote the power of the gang; promoting and enhancing its activities through firearms trafficking; intimidating and frightening victims; distributing controlled substances; using violence and threats of violence to collect drug debts.

e. All of the activity undertaken by RED SKIN KINGZ is based on their desire to dominate, create an atmosphere of fear, and have power on the reservation.

f. RED SKIN KINGZ members are predominately also members of the Navajo Nation. Typically new initiates must submit to a fourteen-second "beat-in" after an informal probationary period. Status is gained by selling drugs and "putting in work" for RED SKIN KINGZ. "Putting in work" includes dealing drugs, collecting drug debts and physically assaulting members of the community on behalf of the gang. Membership can

also be granted to blood relatives of current members with less stringent requirements.

g. RED SKIN KINGZ has a loosely structured informal hierarchy. At all times relevant to this Information, the leader of RED SKIN KINGZ was DEVAN EDWARD LEONARD, who used the title "King." RANDALL FRANKLIN BEGAY was the second highest-ranked member of the RED SKIN KINGZ and was referred to by his honorary title, "Prince." At all times relevant to this Information, other members and associates of RED SKIN KINGZ included, but was not limited to KYLE FILBERT GRAY, LUCILLE JEAN LEONARD and URIAH SHAY.

h. Members of RED SKIN KINGZ show their allegiance to the gang by wearing clothes that are maroon or burgundy, or includes the logo of the National Football League Washington Redskins. Clothing items, including shirts, pants, and hats, are worn in these colors. Members often carry burgundy bandanas or "rags" in their left rear pockets, or covering their faces to conceal their identities.

i. In addition to wearing colors, members also have tattoos to show their allegiance to RED SKIN KINGZ, including the following letters, numbers and images: "RSK", "Kingz", "X4" and "XIV" and a five-pointed crown. The five-points of the crown represent the five core values of RED SKIN KINGZ: Respect, Loyalty, Trust, Family and Honesty.

j. RED SKIN KINGZ hosts gang-related meetings on a random basis at locations the members feel are "safe" for them to use. Much of the gang's activities are focused around the residence and steamed corn business of LUCILLE JEAN LEONARD which is located near Lukachukai, in the District of Arizona. Members discuss completed criminal activity and plan future joint criminal endeavors to be undertaken on behalf of RED SKIN KINGZ.

k. RED SKIN KINGZ has a loose alliance with the Cobras a gang in the Ft. Defiance area of the Navajo Nation reservation. Every other gang on the reservation, particularly the L.A. Boys and South Side, are considered rivals of RED SKIN KINGZ.

l. Members of RED SKIN KINGZ use various forms of social media to

communicate with each other and to raise the gang's profile within the community. In addition to communicating by cellular telephone, members use Facebook to post pictures of gang members, spread threats to individuals and the community and recruit potential new members. Both the cellular telephones and the social media websites are instrumentalities of interstate commerce.

     m.    RED SKIN KINGZ members and associates engaged in criminal activity, including murder, attempted murder, aggravated assault, threatening and intimidating witnesses, firearms use and trafficking in controlled dangerous substances.

     n.    Members of RED SKIN KINGZ commit acts of violence to maintain membership and discipline within the gang and against rival gangs. Participation in criminal activity by a member, particularly when undertaken to support the gang's narcotics distribution activities, increased the respect accorded to that member, and resulted in that member maintaining or increasing their status and position within the gang. Members earned "ink" or the right to wear Red SKIN KINGZ tattoos for work done for the gang's benefit.

     o.    RED SKIN KINGZ, including its leadership, members, and associates, constituted an enterprise, as defined by Title 18, United States Code, Sections 1961 (4) and 1959 (b)(2), that is a group of individuals associated-in-fact that was engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

     p.    On or about December 12, 2014, another member of the RED SKIN KINGZ, Devan Edward Leonard (the "co-defendant"), drove with the victims, Dennis Wilson Charley and Ronald Duane Hardy, to the defendant's residence outside Lukachukai which is within the boundaries of the Navajo Nation Indian Reservation and in the District of Arizona.

     q.    Shortly before they arrived the co-defendant called the defendant on his cell phone and asked the defendant to meet them by the road in front of the residence. The co-

defendant directed the defendant "to be ready to put in some work" and to bring a shotgun to the meeting. The defendant waited by the gate with a shotgun loaded with seven rounds of bird shot. The two victims and the co-defendant arrived in a silver Ford pick-up truck. The co-defendant got out of the truck and demanded that the defendant shoot the victims because they had disrespected the co-defendant. The defendant refused and gave the shotgun to the co-defendant so that he could shoot the victims.

r. The co-defendant returned to the truck and without saying anything shot the two occupants. The driver, Charley, was shot in the face and the passenger, Hardy was shot in the chest causing him to bleed heavily from his mouth. The co-defendant used all seven rounds that the defendant had loaded into the shotgun.

s. The defendant and co-defendant then disposed of the victims' remains. The co-defendant tried to push victim Charley over toward the passenger so that he could drive the bodies away in the victim's truck. Charley was too large and the co-defendant pulled the body from the cab and then with the defendant's help tried unsuccessfully to load the victim into the bed of the truck.

t. The defendant then went to an outbuilding on his property and obtained some bailing twine which was used to tie the victim to the truck's rear bumper. The co-defendant drove slowly along a series of dirt roads to an isolated wash. Twice during the trip, victim Charley, came free from the truck and the two defendants stopped and retied the body to the bumper.

u. During the journey to the wash, the second victim, Hardy, could be heard making gurgling noises. The co-defendant stopped the truck and demanded that the defendant shoot Hardy again. The defendant refused and gave the shotgun, which had earlier been reloaded, to the co-defendant. The co-defendant approached Hardy with the shotgun, at which point Hardy pleaded, "I'm already dead, don't shoot." The co-defendant jumped into the vehicle and yelled "Fuck you, this is Westside RedSkin Kingz" and then shot the victim in the face.

v. When they arrived at the wash selected by the co-defendant, the defendant

1  was directed by the co-defendant to dig a hole. The two victims' bodies were then dismembered by the co-defendant and burned along with various parts stripped from the victim's pick-up truck. The defendant and co-defendant also burned their own clothes that were covered with the two victims' blood.

w.  The defendant and co-defendant left the wash and started walking back to the defendant's residence. Before they reached the residence they were picked up by the co-defendant's father. The defendant and co-defendant were driven to the co-defendant's residence where they gathered additional supplies before returning later that day to the wash to finish burning the victims' remains and bury the ashes. Prior to being picked up by the co-defendant's father, the co-defendant's mother called the defendant's cell phone. The defendant spoke briefly with the co-defendant's mother prior to passing the telephone to the co-defendant. The defendant then heard the co-defendant tell his mother on the telephone that "we got them."

x.  During the years listed above, the defendant and co-defendant as well as other members of RSK made money by selling drugs including methamphetamine and cocaine. The co-defendant, usually accompanied by other RSK members including the defendant, would travel to Phoenix or Ft. Defiance, Arizona, or Farmington, New Mexico, among other places to obtain drugs for resale. When the co-defendant returned to Lukachukai he would apportion out the drugs to several gang members for sale. The gang sold drugs throughout the Navajo Nation community either for cash, or on credit also referred to as "on front." The methamphetamine traveled in interstate commerce prior to being sold by RSK.

y.  Members of RSK would assist each other in collecting drug debts, including threatening debtors and beating debtors up to encourage payment for drugs previously sold and consumed. The defendant assisted the co-defendant collect drug debts on many occasions, and also went with the co-defendant and other members of RSK to collect drug debts owed to the co-defendant's mother.

## APPROVAL AND ACCEPTANCE OF THE DEFENDANT

I have read the entire plea agreement with the assistance of my attorney. I understand each of its provisions and I voluntarily agree to it.

I have discussed the case and my constitutional and other rights with my attorney. I understand that by entering my plea of guilty I shall waive my rights to plead not guilty, to trial by jury, to confront, cross-examine, and compel the attendance of witnesses, to present evidence in my defense, to remain silent and refuse to be a witness against myself by asserting my privilege against self-incrimination, all with the assistance of counsel, and to be presumed innocent until proven guilty beyond a reasonable doubt.

I agree to enter my guilty plea as indicated above on the terms and conditions set forth in this agreement.

I have been advised by my attorney of the nature of the charges to which I am entering my guilty plea. I have further been advised by my attorney of the nature and range of the possible sentence and that my ultimate sentence shall be determined by the Court after consideration of the advisory Sentencing Guidelines.

My guilty plea is not the result of force, threats, assurances, or promises, other than the promises contained in this agreement. I voluntarily agree to the provisions of this agreement and I agree to be bound according to its provisions.

I understand that if I am granted probation or placed on supervised release by the Court, the terms and conditions of such probation/supervised release are subject to modification at any time. I further understand that if I violate any of the conditions of my probation/supervised release, my probation/supervised release may be revoked and upon such revocation, notwithstanding any other provision of this agreement, I may be required to serve a term of imprisonment or my sentence otherwise may be altered.

This written plea agreement, and any written addenda filed as attachments to this plea agreement, contain all the terms and conditions of the plea. Any additional agreements, if any such agreements exist, shall be recorded in a separate document and

may be filed with the Court under seal; accordingly, additional agreements, if any, may not be in the public record.

I further agree that promises, including any predictions as to the Sentencing Guideline range or to any Sentencing Guideline factors that will apply, made by anyone (including my attorney) that are not contained within this written plea agreement, are null and void and have no force and effect.

I am satisfied that my defense attorney has represented me in a competent manner.

I fully understand the terms and conditions of this plea agreement. I am not now using or under the influence of any drug, medication, liquor, or other intoxicant or depressant that would impair my ability to fully understand the terms and conditions of this plea agreement.

Date 10-13-16

RANDALL FRANKLIN BEGAY
Defendant

**APPROVAL OF DEFENSE COUNSEL**

I have discussed this case and the plea agreement with my client in detail and have advised the defendant of all matters within the scope of Fed. R. Crim. P. 11, the constitutional and other rights of an accused, the factual basis for and the nature of the offense to which the guilty plea will be entered, possible defenses, and the consequences of the guilty plea including the maximum statutory sentence possible. I have further discussed the concept of the advisory Sentencing Guidelines with the defendant. No assurances, promises, or representations have been given to me or to the defendant by the United States or any of its representatives that are not contained in this written agreement. I concur in the entry of the plea as indicated above and that the terms and conditions set forth in this agreement are in the best interests of my client. I agree to make a bona fide effort to ensure that the guilty plea is entered in accordance with all the requirements of Fed. R. Crim. P. 11.

Date  10-13-16

MICHAEL J. SMITH
Attorney for Defendant

**APPROVAL OF THE UNITED STATES**

I have reviewed this matter and the plea agreement. I agree on behalf of the United States that the terms and conditions set forth herein are appropriate and are in the best interests of justice.

JOHN S. LEONARDO
United States Attorney
District of Arizona

10-13-16
Date

TRACY VAN BUSKIRK
DIMITRA H. SAMPSON
Assistant U.S. Attorneys

10/13/16
Date

HANS B. MILLER
Trial Attorney

**ACCEPTANCE BY THE COURT**

_____
Date

DAVID G. CAMPBELL
United States District Judge

- 15 -